Clyde SMITH, Plaintiff-Appellant,

v.

STATE OF GEORGIA and Department
of Human Resources; et al.,
Defendants-Appellees.

No. 81–7811.

United States Court of Appeals,
Eleventh Circuit.

Aug. 26, 1982.

Robert H. Stroup, Atlanta, Ga., for plaintiff-appellant.

Gary R. Hurst, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees.

Before VANCE, JOHNSON and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

Clyde Smith brought this action pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, and the first and fourteenth amendments of the United States Constitution. 42 U.S.C. § 1983. He claims that the defendants violated § 704 of Title VII of the Civil Rights Act of 1964, which prohibits discrimination against persons who have engaged in certain protected activity,[1] when they refused to promote him to a supervisory position in retaliation for his favorable testimony on behalf of a female co-worker during a sex discrimination hearing.

Smith is a white male employed as a counselor with the Disability Adjudication Section (DAS) of the Department of Human Resources of the State of Georgia. The DAS is responsible for examining applications for disability benefits under the United States Social Security System.

Smith was hired as a counselor in 1967 and received a series of promotions until he was elevated to the Quality Assurance Unit in March, 1975. Since that time, he has made several unsuccessful applications for promotion to the position of supervisor.

In March, 1974, DAS counselor Juanita Nicholson filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC) against the DAS, subsequently amending it to include a claim for retaliation. On April 2, 1975, the agency held a grievance hearing. Smith and several other employees testified for Mrs. Nicholson. During the period from April 1, 1975 through December 1, 1978, none of these witnesses were promoted to supervisory positions, although statistical evidence would support a likelihood that at least some of them would have been promoted during the relevant time period, considering the number of times each applied and the number of other applications. After receiving a right to sue letter from the EEOC, Smith filed a complaint in the district court contesting the appellees' failure to promote him in July, 1977, December, 1977 and December, 1978. After an evidentiary hearing, the district court made findings of fact and conclusions of law and, following the allocation of proof in Title VII cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), determined first that Smith had established a prima facie case of a violation of § 704 of the Civil Rights Act by showing by a preponderance of the evidence (1) that he engaged in an activity protected by Title VII (testifying at the hearing), (2) that he was the subject of an adverse employment decision, and (3) that there was a causal connection between the participation in protected activity and the adverse employment action. *Dickerson v. Metropolitan Dade County*, 659 F.2d 574 (Former Fifth Cir.

---

1. Section 704 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, states:

 It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

1981). The burden then shifted to the defendants to clearly articulate a legitimate, non-discriminatory reason for their failure to promote Smith. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The district court held that the defendants met this burden and that Smith then failed to prove by a preponderance of the evidence that the non-discriminatory reasons articulated were pretextual. Judgment was entered for the defendants and Smith filed this appeal.

The promotions made by DAS from 1975 to 1978 were "noncompetitive" as defined by the State Personnel Rules and Regulations. Only permanent status employees from DAS were considered and each person ultimately promoted was certified as eligible by the State Merit System. On each of the three occasions under investigation, the candidates were interviewed and evaluated by promotional committees comprised of supervisors appointed by William Jenkins, the director of the agency. While Jenkins retained discretion as the appointing authority, he regularly selected the top candidates recommended by the promotional committees. Although the guidelines adopted to rank applicants were changed after July, 1977, the district court found that the criteria for evaluating applicants for each period were "job-related and sufficiently objective in nature to be used for the purpose of rating candidates for supervisory positions." Record, vol. 1 at 585. Because Smith does not take issue with this conclusion, his charges arising out of the December, 1977 and December, 1978 promotional periods are easily resolved. Four positions were open in December, 1977, and one was available in December, 1978. Smith was ranked sev-

enth on the 1977 list and ninth by the 1978 committee. Plaintiff's Ex.No. 25, Defendant's Ex.No. 90. Jenkins simply selected the top names off the respective lists of recommendations until he filled all the posts. Record, vol. II at 228; Plaintiff's Ex.No. 25, 47, 48. The guidelines were fair and applied evenly. Smith cannot now complain merely because his name was not among the topmost candidates.

A more difficult problem is posed by the events surrounding the July, 1977 promotions. At that time, the committee reviewed eleven candidates based on three different criteria: (1) oral interviews (60%); (2) a review of each applicant's use of sick leave (15%); and (3) a questionnaire completed by the immediate supervisor (25%). The questionnaire required each candidate's supervisor to rate the applicant on a point system [2] for productivity, quality of work, degree of supervision required, dependability, knowledge of job, ability to work with others, and ability to communicate with others. James Bell, one of the supervisors, gave each of the five applicants he graded a maximum score of 20 on two items—ability to communicate and ability to work with others. The committee felt that this was a deviation from the announced guidelines [3] and as a result drew up two lists for submission to Jenkins.[4] The first list ranked the applicants without adjustment for the perfect scores given by Bell (the pre-adjustment list). The second list adjusted for the perfect scores by awarding every candidate maximum points in those two categories (the post-adjustment list). Only two supervisory positions were available. As a perfect example of the operation of Murphy's

---

**2.** The supervisors were instructed as follows: Please rate the applicants on a scale of 0 to 10 on the 1st four factors (5 is average) and from 0 to 20 on the last three factors (10 is average). Please give a *detailed* and *complete* narrative to explain your rating on *each* element. Thank you for your assistance and cooperation.
Plaintiff's Ex.No. 11.

**3.** The committee's report to Jenkins stated that "[a]fter reviewing these evaluations, the com-

mittee felt that Items 6 and 7 were being ranked by one supervisor at considerable variance with the other supervisors." Plaintiff's Ex.No. 15 (Committee Report to Jenkins).

**4.** Jerry Thomas, chairman of the July 1977 committee, did not return the questionnaires to Bell for revision because he believed that the committee lacked such authority. Record, vol. III at 470.

Law,[5] Smith was ranked second on the post-adjustment list, and third on the pre-adjustment list. The committee submitted both lists to Jenkins accompanied by a memorandum explaining the problem but declined to recommend a preference. Record, vol. I at 347; Plaintiff's Ex.No. 15. Jenkins promoted the top two candidates appearing on the pre-adjustment list, on which Smith's name appeared third. As previously noted, Smith does not contend that the criteria used were invalid or that it was inappropriate for Jenkins to rely on the committee's recommendations. Instead, he asserts that Jenkins' choice of the pre-adjustment list over the post-adjustment list, which decision deprived him of a promotion, was motivated by a desire to retaliate for Smith's earlier participation at Nicholson's sex discrimination hearing. Specifically, Smith assigns error on the district court's ruling that the defendants articulated a reasonably clear and specific legitimate explanation for their actions, the trial court's failure to consider his evidence of pretext and the finding that Smith did not prove that the defendant's reasons were but a pretense for discrimination. Additionally, Smith claims that Bell and the promotional committee violated his rights to due process and equal protection. For reasons assigned later, we affirm in part and remand in part.

Our inquiry into the July 1977 promotion process must necessarily focus on Bell's application of the announced criteria (due process)[6] and Jenkins' motives in choosing the pre-adjustment list over the post-adjustment list (Title VII). Neither issue was satisfactorily addressed at the trial level. The parties and the district court apparently speculated that Bell failed to follow the cryptic guidelines, see note 2, supra, because his questionnaire revealed that he graded items six and seven "based on objective evidence only and not on any personal opinions that cannot be documented." Plaintiff's Ex.No. 14. Relying on this evidence and the fact that Bell gave all of his candidates maximum scores for those two factors, the committee, the parties and the judge assumed that he "departed from the announced guidelines and gave all of the applicants he supervised a perfect score of 20 on two items—ability to communicate and ability to work with others. No other supervisor followed this system in the evaluation of the candidates he supervised." Record, vol. I at 579. Bell never testified as a witness so we are without an explanation of his intent.[7] The evidence before us concerning Bell's system of grading is simply too thin to permit the conclusion that he breached the rules. If anything, it tends to

5. "Anything that can go wrong will go wrong."

6. Smith also contends that the state agency's failure to follow its own regulations, without more, offends due process. While it is possible that disregard for state procedures may support a constitutional claim, e.g., Dunn v. Tyler Independent School District, 460 F.2d 137, 144 (5th Cir. 1972), the two analyses are separate, Field v. Boyle, 503 F.2d 774, 779 (7th Cir. 1974), and even if DAS departed from its own guidelines, not every violation by a state agency of its own rules rises to the level of a due process infringement. Garrett v. Mathews, 625 F.2d 658 (5th Cir. 1980); Bates v. Sponberg, 547 F.2d 325 (6th Cir. 1976). In Bluth v. Laird, 435 F.2d 1065, 1071 (4th Cir. 1970), the Fourth Circuit denounced the Army's failure to comply with its own regulations as unconstitutional because "when the sovereign has established rules to govern its own conduct, it will be held to the self-imposed limitations on its own authority, departure from which denies procedural due process of law." As the Sixth Circuit explained, however, "While courts have gener-

ally invalidated adjudicatory actions by federal agencies which violated their own regulations promulgated to give a party a procedural safeguard, we conclude that the basis for such reversals is not ... the Due Process Clause, but rather a rule of administrative law." Bates v. Sponberg, 547 F.2d 325 at 330 (6th Cir. 1976) (footnote omitted). We disagree with Bluth insofar as it stands for the proposition that every deviation by a state or federal agency from its own rules constitutes a constitutional violation.

7. Bell was deposed in August of 1980 and the deposition was thereafter filed with the clerk of the district court. Record, vol. I at 271. Although the deposition was forwarded to this court, we find no indication in the record that it was ever introduced into evidence or considered by the district court. It is therefore not a part of the record on appeal and we do not consider it in reviewing the evidence. See Fed. R.Civ.P. 32(a).

show that, although he gave high marks in these areas, he did so in conformity with the guidelines and based in significant part on his personal knowledge of the applicants' performances.[8] While the committee may have been suspicious of Bell's generosity in his ratings, there is not enough evidence before us to imply that he failed to follow the guidelines furnished to him. The trial court's determination that Bell deviated from the criteria, then, is clearly erroneous.[9] The result however, remains the same, although for different reasons. In order to show a due process infraction, Smith bore the burden of demonstrating fundamental unfairness based on the use of different grading procedures to rate similarly situated candidates. Since he failed to carry that burden, his due process claim must fail.

■ The Title VII cause of action does not depend so much on whether Bell actual-ly violated the guidelines, but instead hinges on Jenkins' motives in choosing the pre-adjustment list. The trial court's conclusion that Smith made out a prima facie case is undisputed, so the burden of production shifted to the defendants to articulate a legitimate, nondiscriminatory reason for their actions. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The district court stated simply that "the defendants have carried their burden of rebutting the presumption of discrimination by producing evidence that the plaintiff was not promoted to supervisor ... because of legitimate, non-discriminatory reasons." Record, vol. I at 584–85. However, because all of the evidence was presented without Smith challenging the sufficiency of the defendant's rebuttal evidence at the close of

---

**8.** The committee felt that Bell violated the rules because he "had given the people under his supervision maximum points on the questions because he did not have any negative information about them concerning those two areas." Record, vol. III at 467. The following is a list, taken from defendant's Ex.No. 14, of Bell's comments with regard to items 6 (ability to work with others) and 7 (ability to communicate effectively) for each of the candidates he graded. As stated earlier, each comment is prefaced by, "the rating is based on objective evidence only and *not* on any personal opinions that cannot be documented." Each file contained memos as indicated in the comments:

Jolene Green:
6—There are no documented findings of any inability of Jolene to work with others. I was told she did an excellent job as acting supervisor in my absence. (see attached memo).
7—There are no documented findings of any problems with communication. Jolene has shown she can communicate effectively.
Don Hull:
6—Not only are there no documented findings of any inability of Don to work with others, enclosed is a memo of commendation from Theron Miller indicating exceptional ability to deal with hostility expressed (undeservedly) by others due to a special situation. I was told he did an excellent job as acting supervisor in my absence. (see attached memo).
7—There are no documented findings of any problems with communication. Don has shown he can communicate effectively.
Bruce Johnston:

6—There are no documented findings of any inability of Bruce to work with others. I was told she did an excellent job as acting supervisor (see attached memo).
7—There are no documented findings of any problems with communication. (See attached memos.) Bruce apparently was quite effective in training roles in communicating with people. [Four memos praising Johnston's participation in training programs were attached to this questionnaire.]
Lowell Buchanan:
6—There are no documented findings of any inability of Lowell to work with others. I was told he did an excellent job as acting supervisor in my absence (see attached memo)
7—There are no documented findings of any problems with communication. There is an attached memo of commendation of Lowell's training of the Special Claims technical reviewers.
Robert Jackson:
6—There are no documented findings of any inability of Bob to work with others. I was told he did an excellent job as acting supervisor. (see attached memo)
7—There are no documented findings of any problem with communication. Bob has shown he can communicate effectively.

**9.** Although the district court's findings of fact will be upheld unless clearly erroneous, Fed.R. Civ.P. 52(a), we note that the burden of demonstrating clear error is not so great when the finding is based solely on documentary evidence, as is the case here. *Marcum v. United States,* 621 F.2d 142 (5th Cir. 1980).

the state's case, we need not consider this finding in keeping with the rule enunciated in *Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, and *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As the court stated in *Smith v. Farah Manufacturing Co.*, 650 F.2d 64 (5th Cir. 1981):

> The *McDonnell Douglas* burden-shifting analysis is intended to apply to cases where a litigant's rights are affected by the state of the record at some stage short of full proof. In a full proof case, the ultimate issue of fact is always whether the plaintiff was intentionally discriminated against .... The burden of persuading the trier of fact on this issue remains at all times with the plaintiff. When the court has allowed both parties to develop their full proof, the analysis of the evidence should look to whether plaintiff has met the ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination. In such a case, neither the trial court nor this court need parse

the evidence in accordance with the ebb and flow of shifting burdens.

*Smith v. Farah Manufacturing Co.*, 650 F.2d at 68 (citation omitted). Our task, then, is to determine whether the trial court's finding that the plaintiff failed to carry his burden of persuasion is clearly erroneous when viewed in light of all the evidence. *See Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Unfortunately, here we are hampered by inadequate findings of fact. The district court's order does not specifically address Jenkins' motivation in choosing between the two lists.[10] Moreover, a reading of Jenkins' testimony on this crucial point is confusing, to say the least.[11] How that testimony was viewed by the finder of fact should be initially addressed by the trial court.[12] In the present state of the record, we are unable to adequately evaluate the district court's finding of no discrimination without further amplification of its findings supporting that conclusion and the weight that it placed on that evidence. We recognize that Rule 52 "does not require that the trial court set out findings on all the myriad

10. The district court order simply states that "the defendants have carried their burden of rebutting the presumption of discrimination" and goes on to hold that the committee did not act with an improper motive. The court then notes that "a more troublesome problem" developed out of the July, 1977 promotion, but points out that those promoted were well qualified and that Smith had a problem with productivity. Record, vol. I at 585–86. This recitation does not shed any light on Jenkins' preference for the pre-adjustment list.

11. When asked why he decided on the two employees promoted in July, 1977, Jenkins replied,

> Well, as I have said before, we had a published criteria that was well known. The committee was charged with the responsibility of following the published criteria. The supervisor rated, Mr. Bell in this case, his two people, in the manner that he thought was best but he did give them a rating on these two particular items, numbers six and seven, and I made the decision based on the fact that the committee followed the published criteria, that certainly entered into my decision making process at that particular time.
>
> Now, the committee made no recommendation to me as to which list to follow, in fact, I think they wanted me to have that and they

were comfortable with me having that decision to make, but they made the two recommendations to me and it was my decision to choose and to make the decision which I did, and I chose—I chose the top two candidates off of the pre-list.

Record, vol. II at 503, 504. While Jenkins' testimony is difficult to understand, if it is read to mean that he relied on the fact that "the committee followed the published criteria," the explanation becomes even more equivocal. Jenkins and the committee were presented with a novel situation not covered by the guidelines, but which, in fact, resulted from a perceived deviation from the rules.

12. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court left no doubt that a Title VII defendant's articulation of a legitimate reason must be clear and reasonably specific in rebutting the prima facie case before casting the burden of proving pretext on the plaintiff. Here, however, we are not concerned with whether the defendants met their *Burdine* burden, but with whether all of the evidence, considered as a whole and giving due regard to the fact finder's credibility choices, supports a finding of no liability.

factual questions that arise in a case," *Curtis v. Commissioner*, 623 F.2d 1047 (5th Cir. 1980). Nevertheless, the trial court's findings must be "sufficiently comprehensive and pertinent to the issues to provide a basis for decision." *Vicon, Inc. v. CMI Corp.*, 657 F.2d 768 (5th Cir. 1981). Where, as here, the district court did not make a specific finding as to an essential fact, it is appropriate to remand for further findings so that we may then exercise a meaningful review. *E.g., Scheinberg v. Smith*, 659 F.2d 476, 487 (Former 5th Cir. 1981) (*en banc*). For this reason, we think the proper course is to remand to the district court for additional findings concerning Jenkins' choice of lists. In remanding, we, of course, intimate no opinion as to the result. Also, the district court is free to hold further hearings if it feels additional evidence is necessary.

■ We also note that Smith complains that the court failed to consider relevant evidence [13] of Jenkins' past acts of retaliation against similarly situated employees, as indicated by the following excerpt from its order:

The plaintiff also strongly contended that Director Jenkins' attitudes and actions toward certain female employees who charged sex discrimination in promotions are entitled to high probative value in establishing plaintiff's claim of retaliation, or at least on his claim that the defendants' explanations were pretextual. It does appear that the treatment of Juanita Nicholson and Kathy Mays (one of her witnesses) was inappropriate and possibly retaliatory in nature. Those cases are not currently before this court for consideration. They could only be of probative value in this case if the plaintiff had shown that the attitude and conduct of the director of the agency and others involved so tainted the promotion process that the plaintiff was not fairly considered for promotion to caseworker

---

**13.** In attempting to paint a picture of Jenkins as a man who sought retaliation against those who testified at the Nicholson hearing, Smith introduced the closing statement made by Jenkins while representing the DAS at the hearing. Jenkins stated:

Look at the witnesses that she produced .... Everyone of them without exception has been passed over for promotion and several have filed grievances against me and others including Mays, Irvin, and Beauchamp, and you heard Mr. Neeley's testimony about his wife! The truth of the matter is that Mrs. Nicholson has had great problems accepting supervision since the very beginning and has had problems with every supervisor that has ever tried to supervise her. She has been a devisive [sic] influence in the office and her complaints are always the same.

Plaintiff's Ex.No. 5.

Nicholson testified that during the course of the hearing, Jenkins referred to the complainant and her witnesses as "a cohesive conspirator group." Record, vol. II at 100. Jenkins also authored a memorandum recommending adverse action against Nicholson and Kathy Mays, another of the witnesses, because they "continue to cause strife and division in this office." The memo went on to say:

As you know, we went through a very traumatic grievance hearing on Ms. Nicholson with Ms. Mays as one of her witnesses, and they have been at other grievance hearings. The situation since that time has not improved as they have been subversive in our

attempts at getting the Counselor III positions approved through the Merit System. They have had contacts and confrontations with people in the Merit System, some of which have caused embarrassment to this agency and to this office.

Practically everything that arises results in a confrontation between these two employees and their supervisor and/or management. Just this week, as an example, I have received an amended notice from the EEOC dated 6/2/75 regarding Ms. Kathleen Mays. These two individuals continue to try to hide behind a cloak of protection by filing these EEOC grievances to the point of harassment and coercion.

Plaintiff's Ex.No. 4. Subsequently, Jenkins, at the suggestion of his supervisor, rescinded the memo. The evidence also discloses that after the hearing, Nicholson was given a low mark on performance which contrasted sharply with her grades before that time. Nicholson appealed and the report was subsequently removed from her file, over Jenkins' objection, for lack of documentation. Record, vol. II at 106–108. Nicholson settled her claim with the state in 1978. As a condition of the settlement, her personnel files at the DAS were purged. Record, vol. II at 110, 111. Billy Neeley, another of Nicholson's witnesses, also testified that he felt that Jenkins had retaliated against him as a result of his testimony. Record, vol. II at 140–42.

supervisor. The evidence does not establish this.

Record, vol. I at 587. Of course, evidence need not prove the proposition for which it is offered to be probative. Rule 401 states that evidence is relevant if it makes the existence of any fact more probable or less probable than it would be without the evidence. Fed.R.Evid. 401. The language of the order is not clear whether the district court applied the proper standard of relevancy. On remand, the court should clarify whether this evidence was considered as one of the factors relevant to the ultimate determination.

 Smith finally asserts that Bell's purported departure from the guidelines violated his rights to equal protection guaranteed by the fourteenth amendment. It is true that even an isolated event may contravene the equal protection clause if different action is taken against persons similarly situated without showing any rational basis for the disparate treatment. *Zeigler v. Jackson*, 638 F.2d 776 (5th Cir. 1981). A successful equal protection claim, however, requires a showing of purposeful discrimination. *E.g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Here, the evidence does not demonstrate, or even infer, such an improper intent. The district court was correct in concluding that Bell's actions "were not aimed at the plaintiff." Record, vol. I at 589.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REMANDED in part for proceedings consistent with this opinion.