Robert P. SHELEY,
Petitioner-Appellant,

v.

Richard L. DUGGER, Jim Smith,
Respondents-Appellees.

No. 85–3636.

United States Court of Appeals,
Eleventh Circuit.

Aug. 21, 1987.

Timothy J. Corrigan, Jacksonville, Fla., for petitioner-appellant.

Ken McLaughlin, J. Craig Myrick, Asst. Attys. Gen., Tallahassee, Fla., for respondents-appellees.

Before CLARK, EDMONDSON and KEITH*, Circuit Judges.

KEITH, Circuit Judge:

Petitioner-Appellant Robert Sheley appeals the denial of a petition for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner, an inmate in the Florida State Prison, has been confined in "close management" solitary confinement for over twelve years. This case raises three issues: (1) whether petitioner's confinement under "close management" violates his constitutional rights to equal protection; (2) whether petitioner's confinement under close management status in excess of eleven years constitutes cruel and unusual punishment; and (3) whether petitioner's initial placement and continued confinement in close management status violates his constitutional rights to due process. Without expressing any opinion as to whether petitioner's constitutional rights have been violated, we find it necessary to remand the case to the district court so that petitioner may have an opportunity to present facts which he contends will substantiate his claims for constitutional relief.

## I.

### FACTS

Petitioner is a Florida state prisoner serving a life sentence for robbery and possession of a firearm by a felon; a concurrent sentence of thirty-seven years for various other crimes, including assault with

intent to commit murder, shooting into a motor vehicle and aggravated assault; and a consecutive ten-year sentence for escape. He filed a *pro se* petition for writ of habeas corpus, alleging that the prison procedures placing and retaining him in close management (CM) administrative confinement constitute cruel and unusual punishment and a denial of due process and equal protection. The state filed a response asserting that: (1) Petitioner was a security risk because of a prior escape, several attempted escapes, and his possession of a revolver inside the prison; (2) Petitioner was afforded sufficient due process protection to support his subsequent transfer to CM at his administrative hearing which occurred when he was initially placed in administrative confinement; (3) Petitioner was afforded the statutorily required periodic reviews of his CM status, including an opportunity to present his views to the reviewing committees; (4) Petitioner's equal protection and eighth amendment claims were meritless because the statutorily mandated CM procedures have been consistently applied to similarly situated inmates; and (5) the "Assignment Team's" disapproval of the "Classification Team's" recommendations that petitioner's status be changed did not violate state administrative rules and was supported by substantial evidence.

The record indicates that prior to his placement in the Florida State Prison, petitioner attempted to escape from a teaching hospital in Florida. Moreover, on February 28, 1974, petitioner had escaped from the Union Correctional Institution and remained at large until his capture on March 6, 1974. Finally, on May 7, 1974, petitioner attempted to escape from the Osceola County Jail. When he arrived at the Florida State Prison in June of 1974, petitioner was placed in administrative confinement pending the investigation of an attempted escape from the reception and medical center. On January 30, 1975, various escape items were found in petitioner's stomach and rectum. The Classification Team

---

* Honorable Damon J. Keith, United States Court of Appeals for the Sixth Circuit, sitting by designation.

thereafter recommended that petitioner be placed in CM status because he constituted an extreme escape risk. After this recommendation was approved by the Assignment Team in March of 1975, petitioner was assigned to CM status.[1] With the exception of certain time spent in disciplinary confinement, petitioner has been confined in CM status continually since March of 1975.

On June 27, 1977, a .22 caliber revolver and thirty rounds of ammunition were found in petitioner's cell. Petitioner received an additional disciplinary report on July 25, 1980 for the offense of possession of negotiables; he has received *no* disciplinary reports since that time.

Petitioner's CM status has been reviewed periodically in the years he has been confined in CM. On all but one occasion prior to 1980, the Classification Team recommended that petitioner remain in CM status because he was an extreme security and escape risk. On three occasions in 1980 and one in 1982, the Classification Team recommended the Assignment Team place petitioner into the general prison population. However, in each case, the Assignment Team determined that he should remain in CM because he remained a severe escape risk.

On May 7, 1985, the magistrate entered a report and recommendation which dismissed petitioner's habeas petition. He found that petitioner's CM status had been reviewed on a regular basis; that the hearing procedure set out by Florida Administrative Code Rule 33–3.083(4) (1984) was followed each time petitioner's status was evaluated; and that this procedure followed due process requirements. The magistrate also found that petitioner's equal protection and cruel and unusual punishment claims were meritless because petitioner failed to state sufficient facts. The district court adopted the magistrate's report and denied habeas relief.

## II.

## DISCUSSION

Petitioner claims three constitutional violations: equal protection, due process and cruel and unusual punishment. His constitution claims are based on the same facts. Petitioner contends that his twelve-year confinement in CM, the perfunctory reviews of his CM status, and the lack of any objective criteria by which he may be freed from CM make his stay in "temporary" solitary confinement permanent.

### A.  Equal Protection

■  Petitioner asserts that his continuous confinement in CM status violates his constitutional rights to equal protection. He claims that he is being subjected to invidious discrimination, and that there are inmates in the general population who have worse records than his and are greater escape risks. The state responds that there is a sufficient rational basis to support his continued confinement in CM. We disagree with the state's contention.

Suspect classification is not at issue here, and petitioner has made no allegations that any of the actions taken by prison officials were based on race or any other suspect category. Therefore, for equal protection purposes, the state need only show that its action in placing and retaining petitioner in CM confinement is supported by a rational basis bearing a substantial relation to public safety. *See e.g., Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1977); *Green v. McKaskle,* 788 F.2d 1116, 1125 (5th Cir.1986) (state's power to distinguish between prisoners is always subject to the constitutional requirement that substantial and purposeful difference in treatment have some rational basis rather than be arbitrary and capricious). Petitioner's prior escape, his history of attempted escapes, and possession of escape paraphernalia, guns and ammunition did provide a rational basis for initially placing him in CM status and for confining him there for some period of time. However, these violations are over ten years old, and petitioner has had only one minor

---

**1.**  The Assignment Team stated that petitioner was "a very severe security problem".

disciplinary infraction since.[2] Consequently, we believe a substantial question exists on whether the Assignment Team's assessment that petitioner remains a severe escape risk provides a sufficient rational basis to support his continued confinement in CM in the absence of any reported objective evidence other than these ten-year old violations.

## B. Due Process

Petitioner next asserts that his confinement in Close Management violates his rights to due process. Specifically, he argues that he has a constitutionally protected liberty interest in returning to the general prison population.[3] The state responds that he was given a constitutionally adequate hearing when he was committed to administrative confinement prior to his transfer to CM; that his CM status has been reviewed on a periodic basis; and that he has been afforded the opportunity to express his views regarding his CM status. We believe petitioner's procedural due process rights and his substantive due process rights were violated.

### 1. Procedural Process

■ Generally, a prisoner has a protected liberty interest in remaining in the general population. *Wolff v. McDonnell,* 418

U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (holding that placing a prisoner in disciplinary confinement clearly effects liberty interest); *See Parker v. Cook,* 642 F.2d 865, 867–68 (5th Cir.1981)[4] (holding that the due process clause protects only those liberty interests created by the state.) In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the United States Supreme Court held that there were no inmate rights to due process hearings when inmates were placed in non-disciplinary administrative confinement excepting those rights created by the state statute, using mandatory language. *Id.* at 471, 103 S.Ct. at 871. In the context of confining an inmate to administrative segregation the court should establish whether 1) the confinement affects a liberty interest and 2) if so, does the process used to implement such confinement adhere to minimum due process standards. *Id.* at 472, 103 S.Ct. at 871. Finally, the due process analysis requires a balancing of "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." *Id.* at 473, 103 S.Ct. at 872.[5]

■ We believe that petitioner's procedural due process rights were violated.

---

**2.** Prison administrators are accorded substantial deference regarding matters of internal security. *See Rhodes v. Chapman,* 452 U.S. 337, 349, n. 14, 101 S.Ct. 2392, 2400, n. 14, 69 L.Ed.2d 59 (1981). However, without a full administrative hearing we cannot determine if an abuse of discretion has taken place. We express no view on whether petitioner has reformed or whether the fact that his past behavior conceivably provides adequate grounds to keep him confined in CM.

The dissent pontificates that the majority makes no mention of the substantial deference given to prison officials in the management of correctional institutions. Dissenting Opinion, *infra* at 1558–60. We disagree. The majority recognizes the deference given to prison administrators above and in II C of the Cruel and Unusual Punishment Section. Majority Opinion, *infra* at 1557.

**3.** However, petitioner makes no specific allegations of how this liberty interest was deprived.

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the 11th Circuit adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

**5.** The dissent states that the majority opinion, "while correctly citing (the above) standard, does not apply it." See Dissenting Opinion, *infra,* at 1561. Although the majority opinion does not belabor its analysis of the *Hewitt* standard, the majority opinion does apply *Hewitt* to find that petitioner's confinement affects a liberty interest; the process used to implement the confinement does not adhere to minimum due process standards; and reach the conclusion that the balance of interests favors petitioner.

First, the Florida Administrative Code Rule 33–3.083(4) creates an inmate's right to a due process hearing.[6] Second, there is no question that petitioner's confinement effects a liberty interest under *Wolff* and *Parker*. Third, the reviews in the instant case were severely inadequate and therefore the process used to implement the confinement did not adhere to minimum due process standards. Specifically, at many of the reviews petitioner was not present, had no notice of them and had no opportunity to present any arguments.[7] The state argues that there was some evidence presented that petitioner's CM status was considered and reviewed by the Close Management Team on a periodic basis. However, when we balance the above procedural deficiencies in petitioner's review process with the state's argument, we find that the state abridged petitioner's procedural due process rights.

**2. Substantive Due Process**

Petitioner also alleges that his rights to substantive due process have been violated.[8] We agree. Substantive due process is violated when the government engages in actions which "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1500 (11th Cir.1985) *cert. denied*, —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), (quoting *Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952)).[9] "These standards of justice are not authoritatively formulated anywhere as though they were specifics," but it is clear that substantive due process is violated by state conduct that "shocks the conscience," is "brutal" and "offend[s] even hardened sensibilities." *Id.* These standards are applicable to the question of the propriety of petitioner's long-term, indefinite confinement in CM. *Parker v. Cook*, 642 F.2d 865 (5th Cir.1981).[10]

In *Parker*, the former Fifth Circuit held that the Department of Corrections (DOC)

6. Florida Administrative Code Rule 33–3.083(4) provides in pertinent part:

(a) Any inmate placed in Close Management shall be given a hearing before the Close Management Review Team, which may be the Classification Team or another Group of three to five qualified staff members appointed by the Superintendent. The hearing shall be documented on a Report of Close Management, form DC 4–813(c). The inmate may present any facts or arguments relevant to his placement in Close Management. The Close Management Review Team may delay the hearing to allow the inmate additional time to prepare. If the inmate so requests, a state member may be assigned to assist the inmate. (b) the Close Management Review Team shall inform the inmate of the basis of its decision. (c) after the hearing or review has been completed, the recommendation of the Close Management Review Team shall be forwarded to the Superintendent for a final decision.

7. It should be noted that the majority finds little reason to distinguish the use of objective or subjective criteria in evaluating petitioner's long-term indefinite confinement in CM. *See* Dissenting Opinion, *infra*, at 1562–63. While it is true that the Supreme Court in *Hewitt* validated the use of subjective evaluations by prison authorities, *Hewitt*, 459 U.S. at 474, 477 n. 9, 103 S.Ct. at 872, 874 n. 9, the validity of the government's interest in prison safety and se-

curity exists as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk. *Mims v. Sharp*, 744 F.2d 946, 953 (3rd Cir.1984). Without adequate reviews, there is no basis to determine, either subjectively or objectively, if petitioners long-term indefinite confinement is due to the prison officials finding of petitioner's continuing security or safety risk.

8. Petitioner does not specifically so state, but we assume he means that the periodic reviews of his Close Management status were not sufficiently meaningful. Again it has already been established that he has a protected liberty interest in remaining in the general prison population. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

9. Substantive due process claims allege that certain governmental conduct would remain unjustified even if accompanied by the most stringent procedural safeguards. *Gilmere*, at 1500.

10. The dissent notes that "the majority predicates its substantive due process conclusions directly on *Parker*" which the dissent characterizes "only addressed the procedural due process rights of prisoners placed in administrative confinement for punitive reasons." *See* Dissenting Opinion, *infra* at 1565. We disagree. The majority opinion predicates its substantive analysis

regulations which were in effect at the time that petitioner was placed in administrative confinement in 1974 created due process liberty interests in the prisoner so confined and that arbitrary assignments of prisoners to administrative confinement are not authorized. *Parker,* at 873. The court affirmed the district court's holding that the procedures used to place the prisoner in administrative confinement violated due process. Notably, although the prisoner in *Parker* was held in administrative segregation for only *six weeks,* the court found his due process rights had been violated. Here, petitioner has been in administrative confinement for *over twelve years.* Thus, the due process violation is apparent.

The state's attempt to distinguish *Parker* as only applying to the Glades Correctional Institution is without merit. The court in *Parker* limited the relief in that case to the Glades Correctional Institution because that was the institution in which the plaintiff-prisoner was confined and because the prisoner "did not challenge the statewide practices." *Parker,* at 877. Petitioner likewise is only challenging the constitutionality of *his* CM confinement; thus, the *Parker* court's analysis of the due process rights of a Florida prisoner placed in administrative confinement is fully applicable here.[11]

Finally, we believe that the subsequent reviews which petitioner received were severely inadequate. As pointed out in petitioner's initial brief:

(1) There is no evidence that Sheley was present at the reviews or that he had prior notice of them.

(2) There is no evidence that Sheley had an opportunity to present arguments in his favor or to dispute the information upon which the reviewing teams were apparently relying.

(3) After 1977, the reviewing teams did not rely upon any new evidence to keep Sheley in close management.

(4) The classification team consistently recommended that because of Sheley's good behavior since 1975, he should be considered for placement in the general prison population. However, this recommendation was always overruled by the assignment team, without hearing or notice, and often without explaining its reasons for overruling the recommendation.

Brief for the Petitioner at p. 8–12, 17, Sheley v. Wainwright, (11th Cir.1986) (No. 85–3636). We believe the state's procedures have afforded petitioner only the most perfunctory review and also lack expressly articulated factors to guide the review. *See McCray v. Bennett,* 467 F.Supp. 187, 192–93 (M.D.Ala.1978). The state's procedure offers no guide as to how petitioner could re-enter the general population. The practical effect of this procedure is that petitioner could never re-enter the general prison population and thus remain in CM until his prison term runs out.[12]

In sum, we find that petitioner's long-term indefinite confinement in CM shocks the conscience and that petitioner did not receive "meaningful" periodic review. We thus hold that his substantive due process rights have been violated.

---

primarily on the conduct of the state which "shocks the conscience." The *Parker* case was discussed to illuminate how substantive due process standards are applicable to the question of the propriety of petitioner's long-term, indefinite confinement in CM. *See* Majority Opinion, *supra* at 1555.

11. In *Parker,* the state conceded that its administrative confinement regulations violated due process. *Parker,* 642 F.2d at 867. Moreover, this Court and others have cited *Parker* without finding it limited to the Glades Correctional Institution. *Whitehorn v. Harrelson,* 758 F.2d 1416 (11th Cir.1985); *e.g., Lucas v. Hodges,* 730 F.2d 1493 (D.C.Cir. *vacated as moot,* 738 F.2d 1392 (D.C.Cir.1984)). Finally, the annotations

to the DOC's amended administrative confinement regulations disclose that in 1983, the regulations applicable to all Florida prisoners were changed in response to the *Parker* decision to require a due process hearing before a prisoner is placed in administrative confinement.

12. It should be noted that the Supreme Court in *Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9, stated that administrative segregation may not be used as a pretext for indefinite confinement of an inmate. The regulations indicate that CM should be temporary and for the shortest time possible. We believe petitioner's confinement here is indefinite.

## C. Cruel and Unusual Punishment

■ Petitioner asserts that his continuous confinement in Close Management status in excess of eleven years constitutes cruel and unusual punishment. He asserts that CM is punitive in essence; that the length of his confinement in CM status is entirely disproportionate to any offense he may have committed; and that the conditions of confinement in CM inflict unnecessary pain and suffering. The state responds that petitioner must be kept in CM status because he is an escape risk; that such confinement cannot be made free of discomfort; and that he is provided with adequate food, medical treatment and sanitary facilities.

The eighth amendment, which applies to the states through the fourteenth amendment, prohibits the states from imposing punishments that shock the conscience, involve "unnecessary and wanton infliction of pain," offend evolving notions of decency, or are grossly disproportionate to the severity of the offense for which they are imposed. *Hamm v. DeKalb County,* 774 F.2d 1567, 1571–72 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986) (and cases cited therein). Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Although they have been convicted of crimes, prisoners cannot constitutionally be deprived of the "minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399.

A federal court's function, then, in an action challenging prison conditions under the eighth amendment, is to determine the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* at 347, 101 S.Ct. at 2399. The court's function is not "how best to operate a detention facility," especially in light of the fact that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Id.* at 349, n. 14, 101 S.Ct. at 2400 n. 14 (and cases cited therein). However, "it is [the court's] duty, when jurisdiction is properly invoked, to protect prisoners' rights." *Hamm,* 774 F.2d at 1571, (quoting *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.) (en banc), *cert. granted,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970, *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981)).

In the Florida prison system, Close Management is long-term, single-cell confinement apart from the general prison population. Fla.Admin.Code Rule 33–3.-0083 (1985) (previously numbered 33–3.-083). Petitioner claims that he is confined in CM status indefinitely, without any idea about what he could do to be released from segregation, and that he is totally idle, which has resulted in mental and physical deterioration.[13] Although petitioner has not shown that the particular conditions of confinement in CM (in and of themselves) deprive him of the minimal civilized measure of life's necessities, he has been confined in Close Management for over eleven years. In *Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978), the Supreme Court indicated that conditions of confinement tolerable over a short term may become "intolerably cruel" over the long-term. Although the Court rejected the idea that prolonged isolation was in itself cruel and unusual punishment, it recognized that the length of isolation

---

**13.** In the district court, petitioner asserted that CM inmates are confined to their cells twenty-four hours a day, seven days a week except for a five-minute shower three times a week, "limited out-side exercise, if any, and an occasional call out." He claimed that it is difficult to get needed medical attention, that access to legal material is minimal, that visits are severely restricted, and that he cannot have a job or participate in vocational programs. He also claimed that his canteen and money-withdrawal privileges are restricted, that he is not permitted to have a radio or television, and that he is ineligible for parole. The state did not challenge these claims. In fact, the pertinent Florida administrative rules indicate that petitioner's claims about the conditions of confinement in CM are fairly accurate, except that the rules provide for, *inter alia,* daily access to medical care, access to legal materials, and out-of-cell exercise for two hours per week. *See* Fla.Adm.Code Rule 33–3.-0083 (1985) (previously numbered 33–3.083).

was a factor in determining an eighth amendment violation. *Id.* Many courts, have noted that long-term or prolonged and indefinite segregated confinement is a factor to be considered in determining cruel and unusual punishment. *See Jackson v. Meachum,* 699 F.2d 578, 582–84 (1st Cir. 1983). Although prolonged length or indefiniteness of segregated confinement does not violate the eighth amendment in and of itself, some meaningful periodic review should be provided and the prison authorities should explore feasible alternative custodial arrangements. *See Id.* at 584–85.

We cannot distinguish whether petitioner received meaningful periodic review in the present case. Furthermore, the record does not indicate how adequate attempts to find alternative custodial arrangements were made. Thus, there is a substantial question as to whether petitioner's confinement violates the eighth amendment.[14]

### III.

### CONCLUSION

Since petitioner has remained in long-term indefinite CM status allegedly without receiving meaningful periodic review, we remand to the district court with instructions to conduct an evidentiary hearing to develop a complete record of whether petitioner remains an escape risk. We also order the district court to conduct a careful inquiry into the constitutionality of the entire review process in order to determine if the quality of the review is adequate and to determine if adequate procedures were followed.

For these reasons discussed, we VACATE the district court's order and REMAND the case for further proceedings consistent with this opinion.

EDMONDSON, Circuit Judge, dissenting.

Federal courts must accord great deference to the decisions of state prison administrators regarding internal prison security. Because the hard facts of this case have enticed the majority to disregard this deference, I must respectfully dissent.

### A. *Introduction*

The pivotal issue in Sheley's case is the quality of review he has received during his tenure in close management. Before evaluating Sheley's specific allegations, however, it is important to examine the well-established analytic framework we must use when evaluating such claims.[1] We begin with the tenet that, given a court's lack of penological knowledge, decisions by prison officials—who do have expertise in the area—should be given great weight. It is axiomatic that federal courts "possess no expertise in the conduct and management of correctional institutions." *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 200 (8th Cir.1974), *on remand sub nom. Finney v. Hutto,* 410 F.Supp. 251 (E.D.Ark.1976), *aff'd,* 548 F.2d 740 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *see Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979). Aware of this shortcoming, courts often have noted that judgments made by prison authorities are entitled to great weight. *See Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974); *Gardner v.*

---

14. We do not make any determination whether petitioner's long-term indefinite confinement here constituted cruel and unusual punishment. The conditions under which petitioner is confined do not constitute cruel and unusual punishment on their face. However, the district court should consider time length of petitioner's confinement as a factor in its cruel and unusual punishment analysis.

The dissent states that since petitioner has adequate food, clothing, sanitation, medical care and personal safety, the state has therefore met its obligations under the eighth amendment. *See* Dissenting Opinion, *infra* at 1564–65. As stated above, we believe indefinite segregated confinement is a factor which can be considered under the eighth amendment.

1. The majority opinion makes only passing mention of this significant background of deference that should strongly influence all of the issues in this case.

*Joyce,* 482 F.2d 283, 285 (5th Cir.), *cert. denied,* 414 U.S. 1096, 94 S.Ct. 731, 38 L.Ed.2d 555 (1973).[2] This necessary obeisance to the expertise of prison administrators was best described by the Supreme Court in words that bear repeating in full:

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Additionally, "where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Id.* at 405, 94 S.Ct. at 1807. In sum, "wide ranging deference must be accorded the decisions of prison administrators. They, and not the courts, must be permitted to make difficult judgments concerning prison operations." *Newman v. Alabama,* 559 F.2d 283, 286 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978) (per curiam).

This deference to prison authorities, which is heightened when state prisons are involved, is extended even further when the decision at issue involves a prison's internal security—even if a particular prison restriction interferes with a specific constitutional right. *See Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (internal security is "central to all other corrections goals"; "prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry"; constitutional infringements "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security"); *see also Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) ("That deference [expressed in *Bell*] extends ... to prophylactic or preventive measures intended to reduce the incidence of [actual confrontations] or any other breaches of prison discipline.")

This increased deference is predicated on both the importance of prison safety, *Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983) (safety "is perhaps the most fundamental responsibility of the prison administration"), and the necessarily intuitive, subjective nature of security-risk decisions.

In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent.

*Id.* at 474, 103 S.Ct. at 872–73; *see Bell v. Wolfish,* 441 U.S. at 546–48, 99 S.Ct. at 1877–79 (prison officials should be accorded "wide-ranging deference" in adopting policies related to security).

We also must be aware of the limited nature of an inmate's constitutional rights. Obviously, "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *see Bell v. Wolfish,* 441 U.S. at 545, 99 S.Ct. at 1877. Nevertheless, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)

(quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)); *accord Bell,* 441 U.S. at 545–46, 99 S.Ct. at 1877. In defining the parameters of constitutional rights in the prison context, "we cannot automatically apply the ... rules designed for free citizens in an open society." *Wolff,* 418 U.S. at 560, 94 S.Ct. at 2976 (referring to procedural rules); *accord Hewitt,* 459 U.S. at 472, 103 S.Ct. at 872 (same). In simple terms, "Prisoners' constitutional rights are subject to limitations and restrictions that would be intolerable if imposed against the general public." *Wilson v. Schillinger,* 761 F.2d 921, 925 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986); *see also Newman,* 559 F.2d at 286 ("a prisoner does not retain constitutional rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections systems."); *see Hewitt,* 459 U.S. at 467, 103 S.Ct. at 869.

The final, overarching tenet is that "[t]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979). Courts should refuse to enter the fray unless compelled to do so by obviously unconstitutional prison actions that bear no relationship whatsoever to acceptable penological objectives. *See Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807; *Newman,* 559 F.2d at 286.

Proper application of these principles to this case requires that we affirm the district court's order denying the writ; no one has violated Sheley's constitutional rights. The conditions of Sheley's incarceration certainly do not warrant subjecting a Florida prison to the overlordship of federal judges.

### B. *There is no Procedural Due Process Violation.*

The majority holds that Sheley's procedural due process rights have been violat-

ed. I disagree. First, whatever protectable liberty interest an inmate possesses in remaining in the general prison population is a creation of state law and not the Constitution. *See Hewitt,* 459 U.S. at 466–67, 468, 103 S.Ct. at 869, 870; *Wolff,* 418 U.S. at 556–57, 94 S.Ct. at 2975 ("the interest of prisoners in disciplinary procedures is not included in the 'liberty' protected by the Fourteenth Amendment.") The critical issue in determining whether a liberty interest, protected by the Fourteenth Amendment, exists is whether the state "has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates." *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871. Thus, a prisoner does *not* "generally [have] a protected liberty interest in remaining in the general [prison] population," Majority Opinion, *supra* at 1554; that interest exists only if created by the state. *See Hewitt,* 459 U.S. at 469–71, 103 S.Ct. at 870–71; *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) ("as long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him ... the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.").

Although the majority has not engaged in such analysis, I am willing to assume that Florida's guidelines and regulations regarding which prisoners are to be placed in administrative segregated status—and which are to be released—are sufficiently mandatory to warrant the conclusion that

Florida has thereby created in its inmates a protected liberty interest in remaining in the general prison population. *See Hewitt,* 459 U.S. at 470, 103 S.Ct. at 870–71.

If the state creates such a protected liberty interest, certain minimal procedures— either pre- or postsegregation—are required for the initial administrative confinement. *Id.* at 476, 103 S.Ct. at 874.[3] More important for our purposes, the *Hewitt* Court also recognized that once an inmate is administratively segregated by way of proper procedures, due process requires "some sort of periodic review of the confinement of such inmates." *Id.* at 477 n. 9, 103 S.Ct. at 874 n. 9.[4] The difficulty lies in determining the parameters of the process due.

Although the majority implies otherwise, *see* Majority Opinion, *supra* at 1554–55 & n. 6, the procedural protections required by the state are of no moment in deciding the extent of the inmate's federally protected due process rights.[5] Instead, whether the process accorded passes constitutional muster is determined by applying a three-part balancing test in which the court weighs "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). The majority, while correctly citing this standard, does not apply it. *See* Majority Opinion, *supra* at 1554–55.

Few courts have weighed these factors in determining the specific issue we face today: what process is due an inmate, ini-

---

**3.** The *Hewitt* Court went to great lengths to differentiate between process due when a prisoner initially is placed in administrative, rather than disciplinary, confinement. *Wolff* represents the paradigmatic disciplinary analysis; *Hewitt* stands as the prototypical administrative confinement case.

**4.** All of the circuits that have addressed the issue have concluded that some form of periodic review is required. *See Toussaint v. McCarthy,* 801 F.2d 1080, 1101 (9th Cir.1986); *Clark v. Brewer,* 776 F.2d 226, 234 (8th Cir.1985); *Mims*

*v. Shapp,* 744 F.2d 946, 952 (3d Cir.1984); *Jackson v. Meachum,* 699 F.2d 578, 584 & n. 5 (1st Cir.1983). *See also, Gibson v. Lynch,* 652 F.2d 348, 358 (3d Cir.1981); *Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980); *Calloway v. Fauver,* 544 F.Supp. 584, 602 (D.N.J.1982).

**5.** The extent of the state-mandated procedures are relevant only to any state law or state constitution claims the inmate might assert.

tially segregated for administrative purposes for acceptable reasons and by way of proper procedure, who has remained in administrative segregation for an uninterrupted, lengthy term that indicates the segregation is indefinite.[6] Applying the first of the three *Hewitt* factors—the governmental interest at stake—the internal security of the prison and, more importantly, the safety and security of civilians outside the prison in the event of a dangerous felon's escape, is extraordinarily high. Thus, the government's interest here is as high or higher than in *Hewitt. See Mims v. Shapp,* 744 F.2d 946, 951 (3d Cir.1984).

Turning to the second factor, Sheley's interest is greater than the prisoner's interest in *Hewitt.* The relatively low individual liberty interest implicated in an initial, short-term transfer from one restricted environment to a slightly more restricted one, *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872, increases somewhat as time passes. *Mims,* 744 F.2d at 951–52; *Clark v. Brewer,* 776 F.2d 226, 233 (8th Cir.1985).

Although it is difficult to assign exact weight to either the governmental interest or the individual interest, I believe that the government's interest actually is greater. I am willing to assume for purposes of this opinion, however, that the two interests balance out. *See Mims,* 744 F.2d at 952. Thus, the final factor—the value of the additional procedural requirements demanded by the inmate—is determinative. Sheley essentially demands that the state

formulate, distribute and apply objective criteria in deciding whether a prisoner may be released from administrative confinement and that the prisoner appear, in person, and argue his own case each time he is reviewed. Neither of these procedural requirements is warranted by common sense and neither is required by Supreme Court precedent.

First, the use of objective criteria has been implicitly rejected by the Supreme Court. *Hewitt* makes obvious that prison authorities can, and must, use subjective evaluations.[7] *Hewitt,* 459 U.S. at 474, 477 n. 9, 103 S.Ct. at 872–73, 874 n. 9; *Clark,* 776 F.2d at 235; *Mims,* 744 F.2d at 953. "*Hewitt* thus severely undermines the position taken by the [majority in this case] that due process required, as an absolute, the use of objective standards by prison authorities in the periodic reviews of the initial confinement decision." *Id.; see Clark,* 776 F.2d at 236 (specifically rejecting district court's holding that due process required formulation and use of binding, objective evaluative criteria). Objective standards are not only unrequired under *Hewitt,* they are impractical in a real-world sense. To determine whether Sheley remains a security risk requires an intuitive hunch built on years of experience.[8] Such intuitive, case-by-case decisions are not subject to objective criteria.[9]

Turning to the second asserted procedural issue—an inmate's right to appear at his reviews—the majority makes much of the fact that "at many of the reviews petitioner

---

**6.** The Third Circuit, however, addressed this exact point in *Mims v. Shapp,* 744 F.2d 946, 951 (3d Cir.1984) ("Our concern is ... what process is due during the periodic reviews that determine whether the confinement should be continued.") The inmate in *Mims* was imprisoned for murdering a police officer and, while in prison, participated in the killing of a deputy warden; as a result, the inmate was placed in segregation and remained there for five years. The court concluded that his segregation "was of potentially limitless duration." *Id.* at 951. The *Mims* Court applied the three-part test and concluded that periodic review based solely on subjective criteria was constitutionally sufficient.

**7.** *Hewitt,* while not dispositive of this case, is highly instructive in this area. *See Mims,* 744 F.2d at 952.

**8.** I can understand how some prison administrators are unimpressed by Sheley's "clean record" for the past several years. Putting aside the troublesome fact that Sheley somehow obtained a handgun and 34 rounds of ammunition even while in segregation, it hardly is surprising that an inmate in solitary confinement does not get into a lot of trouble.

**9.** Besides Sheley's extensive record of escapes, attempted escapes and possession of escape paraphernalia, the prison authorities have many other factors to weigh. For example, Sheley was serving a life sentence for robbery and possession of a firearm by a convicted felon, as well as a 37 year sentence for assault with intent to commit murder. Thus, Sheley was not a petty offender serving a short time for property crimes; he had an extensive past record of violent acts. Were he to escape, he would present

reviews—the majority makes much of the fact that "at many of the reviews petitioner was not present, had no notice of them and had no opportunity to present any arguments." Majority Opinion, *supra* at 1555. This ignores two issues. First, the *Hewitt* Court noted that although some type of periodic review is necessary to avoid pretextual retention, review of inmates placed in administrative confinement "will not necessarily require that prison officials permit the submission of any additional evidence or statements. Deciding whether a prisoner remains a security risk will be based on facts relating to a particular prisoner— which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials'

general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner." *Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. 874 n. 9. Given the highly subjective nature of the inquiry and that the relevant facts have been very largely established at the outset, the state is required neither to allow Sheley an interview with the Classification or Assignment Teams nor to allow him to present evidence. In other words, an ex parte review of the inmate's status is sufficient.

As a second matter, the majority disregards significant record evidence that Sheley was, in fact, interviewed on virtually all review occasions.[10] Thus, while *Hewitt* indicates that due process in this setting

an immediate, grave threat to the physical well-being of the surrounding community. Moreover, he was subject to two outstanding detainers, one state and one federal. The state prison authorities had to consider this factor as a possible incentive to escape, since Sheley easily could conclude that even if he eventually served his time and was released from the Florida prison system, it was highly likely he would immediately return to another penal institution.

**10.** Sheley was placed in close management on June 27, 1974. The record before us reveals the following reviews, recommendations and interviews.

| Date | Recommendations | Interview | Assignment Team Action |
|---|---|---|---|
| 7/24/74 | CM | X | |
| 1/30/75 | CM | X | |
| 3/20/75 | CM | X | |
| 4/11/75 | CM | X | Approved |
| 5/15/75 | CM | X | " |
| 6/17/75 | CM | X | " |
| 7/17/75 | CM | X | " |
| 9/25/75 | CM | | " |
| 4/12/76 | CM | X | " |
| 6/14/76 | CM | X | " |
| 10/25/76 | CM | X | " |
| 12/9/76 | Review for GPP | X | Denied |
| 6/12/77 | CM | X | Approved |
| 7/22/77 | CM | X | " |
| 11/7/77 | CM | X | " |
| 3/8/78 | CM | X | " |
| 6/19/78 | CM | X | " |
| 10/19/79 | CM | | " |
| 2/13/80 | Review for GPP | X | Denied |
| 3/11/80 | Review for GPP | X | Denied |
| 9/8/80 | Review for GPP | X | Denied |
| 8/19/82 | Review for GPP | X | Denied |
| 1/23/84 | CM | | Approved |
| 2/13/84 | CM | X | " |

| Date | Recommendations | Interview | Assignment Team Action |
|---|---|---|---|
| 3/19/84 | CM | X | " |
| 4/10/84 | CM | | " |
| 5/11/84 | CM | | " |
| 6/21/84 | CM | | " |
| 7/19/84 | CM | | " |
| 8/20/84 | CM | | " |
| 9/24/84 | CM | | " |
| 10/17/84 | CM | | " |
| 11/5/84 | CM | | " |

Record on Appeal, Vol. 1 Tab 12 at A112–A146. "GPP" represents "general prison population"; "CM" represents "close management."

It is unclear whether the record on appeal includes all the reviews Sheley has received, although there are indications that some review records are not before us. For example, the Classification Team report dated 1/23/84 states that "[Sheley's] case has in fact been reviewed by the Classification Team on a monthly basis. [Sheley's] case was most recently reviewed by the Full Assignment Team on 1/5/84, with the Classification Team recommending through [sic] review by the Assignment Team for status change consideration." As the above chart makes clear, however, the records present in the record on appeal do not include monthly reviews or records reflecting a 1/5/84 review by the Assignment Team. Thus, it is possible other reviews occurred but were not included in this record.

It is also worth noting that for those dates on which the above chart indicates no interview occurred (e.g., 9/25/75, 10/19/79), the records do not *state* that no interview occurred; they simply contain no reports of an interview. Thus, it is possible, perhaps likely, that Sheley was interviewed on some of those occasions, even though the Classification Team's reports do not so state. This is especially true for the 1984 reports, which adopted a severely truncated form devoid of the incidental information found in earlier reports.

does not necessarily entail the opportunity to state one's case, Florida nevertheless has periodically allowed Sheley to do just that.

In short, although some form of periodic review is necessary, there is no constitutional infirmity in informal periodic review that places a significant emphasis on internal prison security and bases its conclusions on the purely subjective evaluation of prison authorities. *See Mims,* 744 F.2d at 954. The review Sheley has received, given the nature of the decision, comports with the requirements of due process as established in the Fourteenth Amendment.[11]

### C. *There is no Eighth Amendment Violation.*

I believe the majority misconstrues cruel and unusual punishment by improperly juxtaposing procedural requirements on the eighth amendment. Inmates are entitled only to the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).[12] An eighth amendment violation concerns only the physical nature of an inmate's confinement, not whether proper procedures are employed.[13]

The eighth amendment triggers no *procedural* safeguards: "If the state furnishes its prisoners with reasonably adequate food, clothing, sanitation, medical care, and personal safety ... that ends its obligations under Amendment Eight." *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam). The prisoner's protection against arbitrary punishment is found in the safeguards he must be accorded when he is transferred from the general population to a segregated confinement. Thereafter, if the physical conditions of his segregation—when considered in the context of a lengthy segregation, *see Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978)[14]—are not cruel and unusual, no further eighth amendment analysis is required. *See Newman,* 559 F.2d at 291. The deleterious effects of Sheley's segregated status are said to be the mental, physical and emotional deterioration that result from the inactivity, lack of companionship and low level of intellectual stimulation he receives. These effects are not sufficient to be cruel and unusual punishment under the eighth amendment. *New-*

---

11. I believe it is important to note that we, as federal judges, must avoid imposing our own notions of decency and fair play on the states by way of the Constitution. It is irrelevant that I might require monthly reviews at which Sheley could appear and present all the evidence he wished. Federal courts do not, cannot and should not administer state prisons. We can intercede only when the state crosses the limits specifically established by the Constitution.

12. The eighth amendment proscribes punishment that shocks the conscience, offends society's evolving notions of decency or is grossly disproportionate to the offense. *See Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–71, 57 L.Ed.2d 522 (1978); *Hamm v. DeKalb County,* 774 F.2d 1567, 1571–72 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986).

13. The majority contends that, on remand, the district court must explore whether the state has considered less restrictive alternatives to close management status. Both the Supreme Court and this circuit have rejected this type of analysis. *See Block v. Rutherford,* 468 U.S. 576, n. 11,

104 S.Ct. 3227, 3235 n. 11, 82 L.Ed.2d 438 (1984) ("we affirm that administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives"), *accord Jersawitz v. Hanberry,* 783 F.2d 1532, 1535 (11th Cir.1986).

14. It is important to remember the context in which the *Hutto* Court noted that conditions which are acceptable over a short term may be "intolerably cruel" over a lengthier period. The Court stated that "a filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few weeks and intolerably cruel for weeks or months." *Hutto,* 437 U.S. at 686–87, 98 S.Ct. at 2571. That is, *physical* conditions that are marginally acceptable for a short time may become unacceptable with the passage of time. Obviously, the crucial question relates to the inmate's physical surroundings. Sheley's conditions of confinement are not *physically* unacceptable, whether viewed over a short or long term: he has a clean cell and receives the same food and necessary services as the other inmates.

*man*, 559 F.2d at 291 (refusing to apply eighth amendment to the "uncharted bog" of mental, physical and emotional deterioration); *Jackson*, 699 F.2d at 583 (surveying case law and reaching same conclusion); *Sostre v. McGinnis*, 442 F.2d 178, 193 (2d Cir.1971), *cert. denied sub nom. Sostre v. Oswald*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

As I stated earlier in this opinion, Sheley has a right not to be placed in segregation without penological purpose and without review. *See generally Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (deference to prison officials' decisions does not extend to "actions taken in bad faith and for no legitimate purpose"); *Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9 ("administrative confinement may not be used as a pretext for indefinite confinement"). Any procedural protections, however, are found in the due process clause, not the eighth amendment.[15]

Once the prisoner forfeits his state-created right to remain in the prison population by proving himself to be a security risk, an eighth amendment claim is raised only if the physical conditions of the segregation, considered in the context of the length of the confinement, are below the minimal measures of civilized society. Sheley has adequate food, clothing, sanitation, medical care and personal safety; accord-ingly, the state has met its obligations under the eighth amendment.

**D.** *There is no Substantive Due Process Violation.*

The Supreme Court has established that, when considering decisions by prison administrators that concern internal prison security, "the Due Process Clause [i.e., substantive due process] affords [the prisoner] no greater protection than does the Cruel and Unusual Punishments Clause." *Whitley*, 106 S.Ct. at 1088. As I explained in Section C, I am convinced Sheley's eighth amendment claim is insufficient to warrant a judicial hearing; therefore, under *Whitley*, it cannot suffice under the due process clause.[16]

**E.** *There is no Equal Protection Violation.*

As I see it, the majority has applied the incorrect legal standard to Sheley's equal protection claim. The majority articulates and applies the so-called "rational basis test": they say Sheley's claim must fail if the state demonstrates a rational relationship to a legitimate governmental purpose. Were Sheley assailing the pertinent prison regulation as creating, on its face, impermissible classifications, this would be the correct standard of review.[17] *Allgood v. Morris*, 724 F.2d 1098, 1100 (4th Cir.1984);

---

**15.** Only one circuit has indicated, in any way, that the eighth amendment might trigger procedural requirements. In *Jackson v. Meachum*, 699 F.2d 578, 584 (1st Cir.1983), the court indicated, in dictum, that systematic periodic review of a prisoner's administrative segregation status would be required under either the fourteenth or eighth amendment. I feel that, if squarely faced with the issue, it is highly likely the First Circuit would find that whatever procedural protections exist are located in the fourteenth amendment. Alternatively, to the extent that *Jackson*'s dictum can be read otherwise, I disagree with its analysis as contrary to the entire body of eighth amendment law.

*Jackson* does demonstrate the unlikelihood that length of segregation may render a confinement cruel and unusual. The court surveyed the case law on this issue and concluded that the cases "reveal ... a widely shared disinclination to declare even very lengthy periods of segregated confinement beyond the pale of minimally civilized conduct on the part of prison authorities." *Jackson*, 699 F.2d at 583. In fact, the *Jackson* court cited no cases in which lengthy confinement was held to be cruel and unusual punishment.

**16.** I also note, for the record, that *Parker v. Cook*, 642 F.2d 865 (5th Cir.1981) only addressed the *procedural* due process rights of prisoners placed in administrative confinement for punitive reasons. Nevertheless, the majority predicates its *substantive* due process conclusions directly on *Parker*. *See* Majority Opinion, *supra* at 1555–56.

**17.** I would contend that even were this the correct standard, Florida has posited a rational relationship to a legitimate governmental interest when it avers that it has made a subjective determination that Sheley—a former escapee,

*see Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976); *Brandwein v. California Bd. of Osteopathic Examiners,* 708 F.2d 1466, 4470 (9th Cir.1983).

Sheley contends, however, that the state has discriminatorily applied an otherwise valid regulation. That is, he alleges that prison officials have chosen to apply the regulations to him but not to other inmates with equally bad, or worse, "credentials." The law is that equal protection challenges based on application of a facially valid statute or regulation are not subject to the rational basis test; instead, such attacks require proof of purposeful discrimination based on invidious purposes.

> [t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of *intentional or purposeful discrimination.*

*Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944) (emphasis added). *See McClesky v. Kemp,* —— U.S. ——, —— – ——, 107 S.Ct. 1756, 1766, 95 L.Ed.2d 262 (1987) (defendant alleging equal protection violation must demonstrate purposeful discrimination against defendant; relying on *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) and *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1887); *Ciechon v. City of Chicago,* 686 F.2d 511, 522–23 (7th Cir.1982); *Kuzinich v. Santa Clara County,* 689 F.2d 1345, 1349 (9th Cir.1983); *Smith v. Georgia,* 684 F.2d 729, 736 (11th Cir.1982); *Harrington v. United States,* 673 F.2d 7, 11 (1st Cir.1982); *Jurek v. Estelle,* 593 F.2d 672, 685 n. 26 (5th Cir.1979), *issue vacated without being addressed,* 623 F.2d 929, 931

(5th Cir.1980) (en banc), *cert. denied,* 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981); *Cook v. City of Price,* 566 F.2d 699, 701 (10th Cir.1977); *Zentgraf v. Texas A & M Univ.,* 492 F.Supp. 265, 270 (S.D.Tex. 1980). *See generally,* Annotation, What Constitutes Such Discriminatory Prosecution or Enforcement of Laws as to Provide a Valid Defense in a Federal Criminal Proceedings, 45 A.L.R.Fed. 732.

A habeas corpus petitioner has the burden of establishing that an evidentiary hearing is necessary. *Williams v. Griswald,* 743 F.2d 1533, 1537 (11th Cir.1984). Federal courts have the discretionary power to order such a hearing only if "the petitioner's allegations, if proved, would establish the right to habeas corpus relief." *Id.* (citing and applying standard first set out in *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963)); *Smith v. Wainwright,* 777 F.2d 609, 615 (11th Cir.1985); *Birt v. Montgomery,* 725 F.2d 587, 591 (11th Cir.1984). In making this initial determination, a court must look to the petitioner's allegations—construed liberally if he is pro se, as is Sheley—and the undisputed facts on the record.

The question, therefore, is whether Sheley has presented a prima facie case of "purposeful" discrimination. *See Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967); *Smith,* 684 F.2d at 736. That is, he must point to evidence which indicates both that the prison officials singled him out (which he arguably has shown) *and* that he was singled out for constitutionally impermissible grounds. *See Damiano v. Florida Parole & Probation Comm'n,* 785 F.2d 929, 932–33 (11th Cir.1986); *Snowden, supra; Ciechon, supra; United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.1975); *accord Kuzinich,* 689 F.2d at 1349. Sheley has not met the second requirement; therefore, he is not entitled to an evidentiary hearing.

*Cruz v. Skelton,* 543 F.2d 86 (5th Cir. 1976), *cert. denied,* 433 U.S. ·911, 97 S.Ct.

___

convicted of violent crimes—remains an escape risk and thus threatens the security of the pris-

on and the surrounding community.

2980, 53 L.Ed.2d 1096 (1977), is on point and illustrates application of these concepts; its reasoning should control our decision. In *Cruz,* an inmate contended his equal protection rights were violated because prisoners assigned to his prison were granted parole by the state parole board less often than inmates in other prisons. *Id.* at 91. The court rejected this argument, holding that the inmate-plaintiff's claim had to fail because he "allege[d] no 'invidious discrimination' based on such considerations as race, religion, national origin, or poverty." *Id.* at 92. Mere statistical disparity, without invidious intent, is not enough to state a valid equal protection claim of selective application. *See id.*

Sheley has asserted nothing that even implies that the decision, in his case, was made with discriminatory intent. *See Smith,* 684 F.2d at 736. Absent purposeful invidious discrimination, he is unentitled to a hearing on his equal protection claim.

### F. *Conclusion*

To some, Sheley's claims appear facially inviting. When closely scrutinized under Supreme Court precedent, however, the weaknesses are manifest. Requiring an evidentiary hearing on these allegations establishes bad precedent, especially in light of the significantly heightened deference we owe state prison officials' decisions regarding internal security issues, and places yet another burden on a job—state prison administration—that is virtually impossible in the first instance.

Requiring state officials to participate in time-consuming, expensive and annoying litigation is an injury to the state even if the state ultimately prevails on the merits; thus, requiring evidentiary hearings is no neutral act. The majority interferes with Florida's affairs today in a way that the Constitution does not demand. I would affirm the district court; accordingly, I must respectfully dissent.